UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| BOBBIE N. HINSON | Civil No.:    1:16-CV-1009 |
| VERSUS | JUDGE:    DEE D. DRELL |
| CONCORDIA PARISH SCHOOL BOARD | MAGISTRATE JUDGE: JOSEPH H.L. PEREZ-MONTES |

<u>MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT</u>

**May It Please the Court:**

Plaintiff, Bobbie Hinson, respectfully submits the instant Memorandum in Opposition to Motion for Summary Judgment.

**I.    <u>Factual Background</u>**[1]

**A.    Bobbie Hinson's employment with Concordia Parish School Board.**

Plaintiff, Bobbie Hinson, began her employment with Concordia Parish School Board in 1985, when she was hired to teach Sixth Grade at Ferriday Upper Elementary School.[2]  Ms. Hinson remained in that position for over ten (10) years.[3]  Eventually, Ms. Hinson later promoted to Assistant Principal of Ferriday Lower Elementary ("FLE"), and she remained in that position for three (3) years, until her promotion to Principal of FLE in 2011.[4]  Her duties as Principal of FLE generally included scheduling, supervision, oversight of the core curriculum and assisting

---

[1]  Pursuant to Local Rule 56.1, Ms. Hinson's Statement of Material Facts sets forth the detailed facts of this case with citation references.  Additionally, this Memorandum in Opposition is timely filed within 21 days of the December 1, 2017 Notice of Motion Setting, Date of Notice, December 1, 2017.  <u>See</u> R., Doc. # 19.

[2]  <u>See</u> Exhibit 1, Deposition of Bobbie N. Hinson, p. 30, lns. 1-25. n.  Ms. Hinson holds a Bachelor's Degree and a Master's Degree in Education for grades Pre-K through 8 from the University of Southern Mississippi, as well as licenses to teach in Louisiana and in Mississippi. <u>Id.</u> at p. 29, lns. 3-15.

[3]  <u>Id.</u> at p. 30, lns. 17-25.

[4]  <u>Id.</u> at p. 34, lns. 21-24; p. 35, lns. 13-14.

and evaluating teachers and other staff members.[5]   Ms. Hinson remained employed by CPSB as principal of FLE from 2011 until she was forced to retire from her positon in 2015 after refusing to attend and supervise physically demanding "extended day" and/or extracurricular sporting activities Ferriday Junior High ("FJH").[6]

**B.      Timeline of events leading to Ms. Hinson's constructive discharge.**

During the 2014-2015 academic year that Ms. Hinson completed and the 2015-2016 academic year that she would have completed had she not been transferred, CPSB had approximately six hundred (600) full-time employees.[7]  Dr. Paul Nelson was the superintendent of schools for Concordia Parish and an employee of CPSB from 2012 through a portion of the 2015-2016 school year, until he resigned from his position in December 2015 over what he claimed to be a "difference of opinion" with various CPSB board members.[8]

Dr. Nelson confirmed that Ms. Hinson was sufficiently qualified to be the principal at either FLE or FJH.[9]  For the 2013-2014 academic year, Ms. Hinson's overall evaluation rating was "highly effective" at 3.68 out of 4.0.[10]  There is no rating above "highly effective" for a Principal for CPSB.[11]  For the 2014-2015 academic year, Dr. Nelson performed the evaluation rating and confirmed that her overall evaluation rating improved from 3.68 the previous year to 3.72, again rating her as "highly effective."[12]

Although Dr. Nelson was initially unaware that Ms. Hinson underwent surgery on her left foot in June 2014, at the time of the surgery, he was informed by one of his subordinates,

---

[5] Id. at p. 36, lns. 3-9.
[6] Id. at p. 8, lns. 21-25; p. 9, lns. 1-5; p. 35, lns. 22-24; p. 71, lns. 6-16; p. 138, lns. 22-25; p. 139, lns. 1-16; p. 142, lns. 1-25; p. 143, lns. 1-25; p. 144, lns. 1-11.
[7] See Exhibit 2, Deposition of Paul Nelson, p. 23, lns. 11-15.
[8] Id. at p. 13, lns. 16-25; p. 14, lns. 1-24.
[9] Id. at p. 48, lns. 5-18.
[10] Id. at p. 56, lns. 15-25; p. 57, lns. 1-13.
[11] Id.
[12] Id. at p. 58, lns. 11-21.

Rhonda Moore or Cindy Smith, prior to school commencing in August for the 2014-2015 academic year, that Ms. Hinson had undergone foot surgery and would not be able to report to school until after the usual report date in July 2014.[13]  Dr. Nelson made trips to FLE each week or every other week during the 2014-2015 academic year and knew that Ms. Hinson was in a walking boot following her surgery for a portion of that year.[14]  Dr. Nelson also knew during that period that Ms. Hinson was participating in physical therapy for her foot, and that she had to leave school on multiple occasions to obtain treatment with her physician in Baton Rouge.[15]

Dr. Nelson made the ultimate decision to transfer Ms. Hinson from FLE to FJH.[16]  In an April 7, 2015 meeting, Dr. Nelson and Cindy Smith, the Director of Elementary Education for CPSB, approached Ms. Hinson and asked her to retire from her position as Principal of FLE.[17]  At that time, Ms. Hinson refused to retire.[18]  Dr. Nelson then advised Ms. Hinson that she would likely be transferred to FJH.[19]  Ms. Hinson advised him that she would prefer to remain at FLE.[20]

Dr. Nelson described Ms. Hinson's duties as Principal of FLE as being involved in scheduling, making curriculum decisions for the school, textbook purchases, software purchases and overseeing the general maintenance and operation of the school.[21]  The duties required of her as Principal of FJH would be similar, but with the critical distinction that Ms. Hinson would have to supervise extracurricular activities and extended day activities, including football and

---

[13] Id. at p. 30, ln. 25; p. 31, lns. 3-25; p. 32, lns. 1-14.
[14] Id. at p. 32, lns. 20-25; p. 33, lns. 1-15.
[15] Id. at p. 39, lns. 3-11.
[16] Id. at p. 70, lns. 14-17.
[17] See Exhibit 1, Deposition of Bobbie Hinson, p. 85, lns. 17-24; p. 93, lns. 7-25.
[18] Id. at p. 64, lns. 20-24.
[19] See Exhibit 2, Deposition of Paul Nelson, p. 77, lns. 2-22.
[20] Id. at p. 77, lns. 19-22.
[21] Id. at p. 33, lns. 16-24.

basketball events from September through December, which would also require her to be mobile and supervising students during each of those events.[22]

Notably, Dr. Nelson confirmed that CPSB's "Extra Duty" policy governing the attendance of staff at extracurricular and athletic events did not require Ms. Hinson's presence at any such event but allowed her to assign such activities among her subordinate staff.[23]   However, even after Ms. Hinson expressed her desire not to attend extended day activities due to her health concerns, Dr. Nelson made no accommodation for Ms. Hinson, despite the Extra Duty policy directing him to do so, but instead, demanded that she attend extended day activities as a condition of employment at FJH.[24]

On May 21, 2015, Dr. Nelson sent Ms. Hinson correspondence confirming that he had spoken with CPSB's attorney regarding her transfer to FJH and had been advised that Ms. Hinson's "attendance and supervision at such events are, in fact, part of your job responsibilities as principal there and you should make plans to fulfill that responsibility as required by your job description."[25]   No policy from CPSB regarding the alleged "job description" referenced by Dr. Nelson exists that would require Ms. Hinson to attend extended day or extracurricular activities, and the only policy addressing such activities, the Extra Duty policy, directly contradicts Dr. Nelson's May 21, 2015 directive to personally attend and supervise such events.[26]   Dr. Nelson contacted CPSB's attorney prior to writing the May 21, 2015 letter to Ms. Hinson in an effort "to hold her accountable for attending extracurricular activities," as opposed to making any

---

[22] Id. at p. 33, ln. 25; p. 34, lns. 1-25; p. 35, lns. 1-18; p. 78, ln. 25; p. 79, lns. 1-22.
[23] Id. at p. 81, lns. 2-25; p. 82, lns. 1-25; p. 83, lns. 1-25; p. 84, lns. 1-25; p. 85, lns. 1-18.
[24] Id.
[25] Id. at p. 99, lns. 16-25; p. 100, lns. 1-7
[26] Id. at p. 81, lns. 18-25; p. 82, lns. 1-25; p. 83, lns. 1-25; p. 84, lns. 1-25; p. 85, lns. 1-18.

accommodation for her request not to attend such activities.[27]  When Ms. Hinson told Dr. Nelson

that she would not attend those events, he responded that, "I told her yes, she is."[28]

Arlana Davis, who was Principal at FJH for the 2014/2015 school year, confirmed that

during football games at FJH, she had to walk up and down, under the bleachers, towards the

field and even in the bleachers as a part of her supervisory role because the students were more

aggressive and would get into mischief at the games.[29]  Ms. Davis became principal of Vidalia

Lower Elementary in July 2015, and confirmed that the requirements upon her as Principal of

FJH were "absolutely" more physically demanding than as a principal of a lower elementary

school, such as FLE.[30]  Even so, Dr. Nelson never made any accommodation to Ms. Hinson that

would allow her to assign others to attend and supervise at those extracurricular events, as

CPSB's Extra Duty policy required him to do.[31]

On May 22, 2015, despite being well aware of Ms. Hinson's concerns, Dr. Nelson sent

Ms. Hinson a letter stating that her transfer to FJH would be effective on July 1, 2015.[32]  Thus,

Dr. Nelson and CPSB also failed to accommodate Ms. Hinson by their decision to transfer her

from FLE, a school where the more physically demanding extended day and extracurricular

activities were not required.[33]

On May 28, 2015, well prior to the July 1, 2015 effective date of Ms. Hinson's transfer

referenced by Dr. Nelson, Dr. LaRavia sent a letter to Dr. Nelson, advising that he had seen Ms.

Hinson that day and determined that she needed to go on medical leave from June 1, 2015 until

---

[27] Id. at p. 100, lns. 8-12.
[28] Id. at p. 101, lns. 11-13.
[29] See Exhibit 7, Deposition of Arlana Davis, p. 54, lns. 9-25; p. 55, lns. 1-25; p. 56, lns.
[30] Id. at p. 56, lns. 13-25; p. 57, lns. 1-4.
[31] See Exhibit 2, Deposition of Paul Nelson, p. 37, lns. 20-25; p. 38, lns. 1-4.
[32] Id. at p. 104, lns. 7-11.
[33] Id.

August 2015.[34]   While Dr. Nelson claims that the letter from Dr. LaRavia did not "rise to the level" for him to approve extended leave and that Ms. Hinson supposedly did not provide the correct medical leave forms, he granted her request for medical leave nonetheless.[35]   Dr. Nelson acknowledges that, at that time, before the July 1, 2015 effective date of Ms. Hinson's transfer to FJH, he had knowledge that Ms. Hinson had a medical condition serious enough to be placed on medical leave until the beginning of August 2015.[36]   Dr. Nelson also admits that he would never have granted sick leave to Ms. Hinson if she had not suffered from a condition that limited her ability to work.[37]

On May 29, 2015, Ms. Hinson sent Dr. Nelson an e-mail advising him that Dr. LaRavia had requested that she go on medical leave due to ongoing health concerns for the duration of the summer and potentially longer.[38]   She submitted a medical leave request form pursuant to CPSB policy.[39]   Ms. Hinson also advised Dr. Nelson that:

> . . . [I]t is my intent to maintain my duties as a principal.  However, as I tried to explain to you, I do have health issues that prevent extended extra curricul[ar] activities.  Since . . . there are several elementary school positions within the Concordia Parish System, it would be my hope that in planning staffing for the 2015-16 school year you will consider my overall health concerns.  My duties as an elementary principal at FLE are not prohibited by my health.[40]

After Dr. Nelson was put on notice by Dr. LaRavia and Ms. Hinson that she had health concerns in May 2015 that were serious enough to warrant a request for accommodation in not being moved from FLE and serious enough to warrant a medical leave of at least two months, Dr. Nelson made no accommodation for Ms. Hinson, denied her request to be excused from

---

[34] Id. at p. 104, lns. 20-25; p. 105, lns. 1-6.
[35] Id. at p. 92, lns. 13-24.
[36] Id. at p. 104, lns. 7-25; p. 105, lns. 1-17.
[37] Id. at p. 142, lns. 20-24.
[38] Id. at p. 107, lns. 14-25; p. 108, lns. 1-4.
[39] Id. at p. 11-21.
[40] Id. at p. 108, lns. 10-19.

extended day activities and denied her request to remain as principal at FLE.[41]   On May 29, 2015, Dr. Nelson sent a reply e-mail to Ms. Hinson to advise her that her medical leave "does present a problem"  for him and that unless and until a job opening occurred, "[i]n the interim, I would hope that you would work to complete all of the responsibilities of your job description regardless of site location."[42]   CPSB admits that all Dr. Nelson had to do to accommodate Ms. Hinson's health-based limitations was to advise Ms. Hinson to remain as Principal of FLE.[43]

On June 29, 2015, as a result of having received Dr. Nelson's refusal to allow her to remain at FLE or to allow her to forego participation in the physically demanding extended day activities at FJH, Ms. Hinson was forced to retire or potentially suffer further damage to her health.[44]   Accordingly, she tendered a letter to Dr. Nelson and advised him that she was retiring, effective immediately.[45]

### C.     CPSB's treatment of non-disabled employees.

When Dr. Nelson decided to transfer Ms. Hinson from FLE to FJH, he transferred Rick Brown to Ferriday Lower Elementary from his position as Principal of Vidalia High School.[46]   Mr. Brown had no substantial limitations in his ability to perform the work duties at FLE based on any physical or medical condition or disability.[47]   Likewise, Arlana Davis, who later replaced Mr. Brown at FLE, had no health condition or restriction that would prevent her from doing any activity.[48]

---

[41] Id. at p. 108, ln. 25; p. 109, lns. 1-25; p. 110, lns. 1-20; p. 113, lns. 1-25; p. 118, lns. 1=25; p. 119, lns. 1-11.
[42] Id. at p. 119, lns. 20-25; p. 120, lns. 1-18.
[43] Id. at p. 120, lns. 19-25; p. 121, lns. 1-12.
[44] Id. at p. 146, lns. 4-21; see also, Exhibit 1, Deposition of Bobbie Hinson, p. 138, lns. 19-25; p. 139, lns. 1-3.
[45] Id. at p. 146, lns. 4-21.
[46] Id. at p. 86, lns. 9-21.
[47] Id. at p. 138, lns. 15-24.
[48] Id. at p. 66, lns. 10-23.

## II.     **Procedural History**

On September 3, 2015, Ms. Hinson filed a timely charged of disability and retaliation discrimination with the U.S. Equal Employment Opportunity Commission (EEOC), as required by 42 U.S.C. §12117.[49]  On or about May 23, 2016, Plaintiff received a "Notice of Right to Sue" from the EEOC.[50]  On July 8, 2016, Ms. Hinson filed her Complaint in this matter, asserting claims Under the ADA and the Louisiana Employment Discrimination Law.

## III.    **Law and Analysis**

### A.  **Ms. Hinson's burden of proof.**

In <u>Seaman v. CSPH, Inc.</u>, 179 F.3d 297, 300 (5th Cir. 1999), the Fifth Circuit held that a plaintiff "may establish a claim of discrimination under the ADA either by presenting direct evidence or by using the indirect method of proof set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)."  Only in the absence of direct evidence of discrimination under the ADA, under the <u>McDonnell Douglas Corp.</u> analysis, must a plaintiff show:

> that he or she (1) suffers from a disability; (2) was qualified for the job; (3) was subject to an adverse employment action; and (4) was replaced by a non-disabled person or treated less favorably than non-disabled employees.   The employer then must show a legitimate, non-discriminatory reason for its action.[51]

Once the defendant articulates a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the defendant's articulated reason is false and that prohibited discrimination is the real reason for the employer's action.[52]  The question is not whether the plaintiff proves pretext,

---

[49] <u>See</u> Exhibit 8, EEOC Charge of Discrimination.
[50] <u>See</u> Exhibit 9, Notice of Right to Sue letter.
[51] <u>See</u> <u>Seaman</u>, 179 F.3d at 300 (citing <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802-803).
[52] <u>See</u> <u>Grimes v. Texas Dep't of mental Health & Mental Retardation</u>, 102 F.3d 137, 140 (5th Cir. 1996).

but whether the plaintiff raises a genuine issue of fact regarding pretext.[53]   Pretext can be demonstrated in two ways, "either directly by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence."[54]

In this case, there is, in fact, direct evidence of disability discrimination and retaliation under the ADA.  Even if there was not direct evidence of discrimination, there is a genuine issue of fact regarding Dr. Nelson's and, accordingly, CPSB's pretext reasoning behind the transfer of Ms. Hinson to FJH, the refusal to accommodate her physical limitations at FJH and the refusal to transfer her back to a position that she was physically and mentally capable of performing at FLE.

### B.  Ms. Hinson was and is disabled within the meaning of the ADA and LEDL.

In 2008, Congress rejected the courts' often exclusionary application of the ADA's definition of "disability."  The ADA Amendments Act of 2008 ("ADAAA"), PL 110-325, 122 Stat 3553 (2008), was passed as "An Act to restore the intent and protections of the Americans with Disabilities Act of 1990."  Congress stated that the purpose of the ADAAA is, in pertinent part:

> (2) to reject the requirement enunciated by the Supreme Court in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) and its companion cases that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures;
> (3) **to reject the Supreme Court's reasoning in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) with regard to coverage under the third prong of the definition of disability and to reinstate the reasoning of the Supreme Court in School Board of Nassau County v. Arline, 480 U.S. 273 (1987) which set forth**

---

[53] See Hall v. Gillman, Inc., 81 F.3d 35, 37 (5th Cir. 1996).
[54] Id. (citing Thornbrough v. Columbus and Greenville R. Co., 760 F.2d 633, 639 (5th Cir. 1985)(citing Texas Dep't of Community Affairs v. Burdine, 450U.S. 248, 255 n. 8, 101 S.Ct. 1089, 1094 n.8, 67 L.Ed.2d 207 (1981))).

a broad view of the third prong of the definition of handicap under the Rehabilitation Act of 1973;

(4) **to reject the standards enunciated by the Supreme Court in** <u>**Toyota Motor Manufacturing, Kentucky, Inc. v. Williams**</u>**, 534 U.S. 184 (2002), that the terms "substantially" and "major" in the definition of disability under the ADA "need to be interpreted strictly to create a demanding standard for qualifying as disabled," and that to be substantially limited in performing a major life activity under the ADA "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives";**

(5) **to convey congressional intent that the standard created by the Supreme Court in the case of** <u>**Toyota Motor Manufacturing, Kentucky, Inc. v. Williams**</u>**, 534 U.S. 184 (2002) for "substantially limits", and applied by lower courts in numerous decisions, has created an inappropriately high level of limitation necessary to obtain coverage under the ADA,** to convey that it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.[55]

In <u>School Board of Nassau County, Fla v. Arline</u>, 480 U.S. 273, 279, 107 S.Ct. 1123 (1987). the holding "reinstated" by the ADAAA, the Supreme Court examined the definition of "handicapped individual" under the Rehabilitation Act of 1973.  The Court held that "Congress expanded the definition of 'handicapped individual' **so as to preclude discrimination against "[a] person who has a record of, or is regarded as having, an impairment [but who] may at present no actual incapacity at all."**[56]   The Court further held that the plaintiff's condition, tuberculosis, "was serious enough to require hospitalization, a fact more than sufficient to establish that one or more of her major life activities were substantially limited by her impairment."[57]   The Court further held that the plaintiff's hospitalization in 1957, over twenty

---

[55] <u>See</u> ADAAA, PL 110-325, 122 Stat 3553 (2008).  (Emphasis Added).
[56] <u>See</u> <u>Arline</u>, 480 U.S. at 279.  (Emphasis Added).
[57] <u>Id.</u> at 281.

(20) years prior to her termination, sufficed to establish that she had a "record of impairment" and was therefore "handicapped."[58]

In this case, there is no dispute that Ms. Hinson was hospitalized at Champion Medical Center on June 13, 2014 to undergo left foot surgery and required ongoing treatment, multiple other left foot surgeries and rehabilitation. That alone is sufficient to establish that Ms. Hinson had a "record of impairment."

The definitions of "handicapped" in the Rehabilitation Act and "disability" in the ADA are the same. Understanding the broad view of "handicapped" taken by the Arline Court, Congress has expressly "reinstated" that holding, which is to be applied to the definition of "disability" under the ADA, as stated in the ADAAA. Thus, Congress clearly favors inclusion, not exclusion, under the ADA.

The ADAAA defined "disability" in the ADA to mean "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[59] Notably, Congress also defined "major life activities" as those activities that "**include, but are not limited to**, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, **walking**, **standing**, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and **working**."[60] Pursuant to the ADAAA, Congress also gave clear directions to the courts for the rules of construction regarding the definition of disability under the ADA, stating, in pertinent part:

> (A) The definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act.

---

[58] Id.

[59] See ADA, 42 USC § 12102.

[60] Id. (Emphasis Added).

. . .

(C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.[61]

The facts and testimony confirm, without contradiction, that Ms. Hinson was substantially limited in the various major life activities of walking, standing and working, at the time that Dr. Nelson transferred her to FJH in May 2015.  Not only did Dr. LaRavia confirm these substantial limitations in major life activities, he noted that more probably than not, Ms. Hinson was substantially limited in her ability to stand, and to perform any job that required Ms. Hinson to remain on her feet for extended periods of time, as the extended day activities at FJH would require Ms. Hinson to do, according to Arlana Davis.  Dr. LaRavia also confirmed that Ms. Hinson was not the type of person who would have been able to deal with the limitations from pain associated with a job, like the one at FJH, which had more strenuous physical requirements in terms of walking, standing, and moving while performing supervision.

Although sufficient to be considered "disabled" under the ADA, a substantial limitation in the ability to work is not a requirement.[62]  In this case, however, Ms. Hinson was substantially limited in the major life activity of working at the time of her transfer in May 2015, and she remained substantially limited in that regard.  As noted in her certified medical records, Ms. Hinson had a twenty (20) to (30) year struggle with left foot pain, underwent multiple left foot surgeries before and after her transfer and, according to her physical therapist at STA Home Health, was still suffering from left pain, decreased strength and range of motion, an abnormal gait and decreased functional activity tolerance on January 5, 2016, long after the effective date of her transfer to FJH on July 1, 2015.

_____

[61] Id.
[62] See 42 U.S.C. §12102(4)(C).

In <u>Dutcher v. Ingalls Shipbuilding</u>, 53 F.3d 723, 727 (5th Cir. 1995), the Fifth Circuit held that:

> **[S]ubstantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes** as compared to the average person having comparable training, skills and abilities.  (Emphasis Added).

Dr. LaRavia specifically testified that Ms. Hinson' disability precluded her from performing a class of jobs, particularly those that required the activities which Dr. Nelson sought to have her perform:

> Q.    And for someone like that, who is, as you described, already overweight, who's reported to you some ongoing issues with left foot problems, and now, let's assume that's accurate, and you find out that she's undergone either three to five foot surgeries before she's even done treatment with you in December 2015, would you agree that that would substantially limit her in terms of working a job that requires her to be standing for extended periods of time?
>
> A.    Standing would be a problem, yes, sir.[63]
>
>                                         . . .
>
> Q.    . . . Now, her psychological condition over the next several visits did improve as she remained off the job, is that correct?
>
> A.    That's right.
>
> Q.    But there is nothing that you're aware of to suggest that her psychological condition, if she had been forced or if she had forced herself to do that work would have improved.  Is that correct?
>
> A.    That's correct.
>
> Q.    In other words, had she come to the realization that, hey, I have to do this job, she very well may have continued to have this panic disorder, this depression and this insomnia. Is that correct?
>
> A.    That's right.

---

[63]  <u>See</u> Exhibit 6, Deposition of Dr. Dennis LaRavia, p. 61, lns. 17-25;

Q.      Do you think, more probably than not, that that was likely, given the way she presented on May the 28th, 2015?

A.      I believe that's true.

Q.      And all of those issues, the panic disorder, the depression and the insomnia, would have substantially limited her ability to perform in that job as the Ferriday Junior High principal, which was the reason that you put her on medical leave, is that correct?

A.      Probably so, yes, sir.

Q.      More probably than not?

A.       Right.[64]

                              . . .

Q.      . . . so the more strenuous the job is in terms of standing, walking, moving while doing supervision, the more likely it is that that person will have limitations from pain.  Is that correct?

A.      They'll have pain limitations, right.  How they handle it will be individual.

Q.      And from what you saw of Ms. Hinson and her psyche, did it appear to you that she handled those kind of things well?

A.      No.

Q.      And in other words, so whereas one person may have been able to deal with those kind of limitations, pain limitations, and tolerate it, Ms. Hinson, would you agree, was not that type of person?

A.      I would have to agree with that.[65]

There is no evidence to contradict Ms. Hinson's assertion that she was and remains substantially limited in various major life activities, including the more strenuous working and standing that would have been required of her at FJH at the time of her transfer, to the present date.  While CPSB contends that she walked regularly at her job, Dr. LaRavia confirmed that she

---

[64] Id. at p. 63, lns. 7-25; p. 64, lns. 1-6.
[65] Id. at p. 68, lns. 19-25; p. 69, lns. 1-8.

was substantially limited with respect the type of more strenuous physical demands of standing, walking and moving about while supervising that would have been required in the extended day activities at FJH.   Accordingly, Ms. Hinson is disabled within the meaning of the ADA.   Additionally, the LEDL, LSA-R.S. 23:322(3), defines disability just as the ADA does.   Thus, because Ms. Hinson is considered disabled under the broad scope of the ADA, as amended by the ADAAA, she is also considered disabled under the LEDL.   At the very least, a genuine issue of material fact exists as to whether she was disabled based on the aforementioned evidence.

### C.    Ms. Hinson was qualified for the position(s) at issue.

There is no dispute that Ms. Hinson was sufficiently qualified to be a Principal at FLE or FJH.   Dr. Nelson confirmed that Ms. Hinson was sufficiently qualified to be the principal at either FLE or FJH.[66]   For the 2013-2014 and 2014-2015 academic year, Ms. Hinson's overall evaluation rating was "highly effective" and even improved from one year to the next.

### D.   Ms. Hinson suffered an adverse employment action due to CPSB's refusal to transfer her back to FLE or another elementary school.

#### 1.    Adverse employment action.

Defendant argues that Ms. Hinson's transfer from was not an adverse employment action because it arose from her "mere subjective preference of FLE over FJH."[67]   Defendant also argues that a lateral transfer is not an adverse employment action.   Both of these arguments are based on the flawed premise that Ms. Hinson was transferred to a position that she could actually perform without accommodations, which were refused by Dr. Nelson.    Ms. Hinson advised Dr. Nelson that she would not be able to participate in extended day activities due to her health concerns on May 29, 2015, as follows:

---

[66]  See Exhibit 2, Deposition of Dr. Paul Nelson, p. 48, lns. 5-18.
[67]  See R., Doc. # 18-2, p. 14 of 33.

. . . [I]t is my intent to maintain my duties as a principal.  However, as I tried to explain to you, I do have health issues that prevent extended extra curricul[ar] activities.  Since . . . there are several elementary school positions within the Concordia Parish System, it would be my hope that in planning staffing for the 2015-16 school year you will consider my overall health concerns.  My duties as an elementary principal at FLE are not prohibited by my health.[68]

The fact that Ms. Hinson was refused a transfer to a position that she could actually perform, as opposed to FJH, was, by definition, an adverse employment action.  For instance, in Alvarado v. Texas Rangers, 492 F.3d 605, 614 (5th Cir. 2007), the Fifth Circuit held:

we conclude that the denial of a transfer *may* be the objective equivalent of the denial of a promotion, and thus qualify as an adverse employment action, even if the new position would not have entailed an increase in pay or other tangible benefits; if the position sought was objectively better, then the failure to award the position to the plaintiff can constitute an adverse employment action.  In determining whether the new position is **objectively better**, a number of factors may be relevant, including whether the position: entails an increase in compensation or other tangible benefits; provides greater responsibility or **better job duties**; provides greater opportunities for career advancement; requires greater skill, education, or experience; is obtained through a complex competitive selection process; or is otherwise objectively more prestigious.[8] This is an objective inquiry; neither the employee's subjective impressions as to the desirability of the new position nor the employee's idiosyncratic reasons for preferring the new position are sufficient to render the position a promotion.  (Internal citations omitted).  (Emphasis Added).

Being transferred to a position at FLE or another elementary school, as Ms. Hinson specifically requested, under which scenario she would not have to engage in more physically strenuous extended day activities, is "objectively better" and has "better job duties" than remaining at FJH, which had the requirement of attending the more physically strenuous extended day activities that she could not perform, according to Dr. LaRavia.  Thus, the failure to transfer her back into such a position upon her request constitutes an adverse employment action.

---

[68] See Exhibit 1, Deposition of Bobbie Hinson, p. 108, lns. 10-19.

16

Furthermore, in <u>EEOC v. LHC Group, Inc.</u>, 773 F.3d 688, 704 fn. 6 (5th Cir. 2014), the Court noted that "[a] failure to accommodate claim provides a mechanism to combat workplace discrimination even when the employee in question *has not* suffered adverse employment action."[69]   Also, in <u>Bridges v. Dep't of Soc. Servs.</u>, 254 F.3d 71, 71 (5th Cir. 2001), the Court held that "[a]lthough [the plaintiff] has suffered no adverse employment action, she may still raise a claim of discrimination based on the alleged failure reasonably to accommodate her disability".

### 2. Constructive discharge.

"A successful claim of constructive discharge entitles an employee who resigned to recover "all damages available for formal discharge."[70]

> An employee's resignation must be reasonable under the circumstances. Whether an employee would feel compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work . . . (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or **(7) offers of early retirement on terms that would make the employee worse off**, whether **the offer was accepted or not.**[71]

The test is an objective, "reasonable employee" test: whether a reasonable person in the plaintiff's shoes would have felt compelled to resign.[72]   No proof that the employer imposed the intolerable conditions with the specific intent to force the employee to resign is required to succeed on a constructive discharge claim.[73]

---

[69] (citing <u>Bridges v. Dep't of Soc. Servs.</u>, 254 F.3d 71, 71 (5th Cir. 2001))(holding that "[a]lthough [the plaintiff] has suffered no adverse employment action, she may still raise a claim of discrimination based on the alleged failure reasonably to accommodate her disability")); <u>see also</u>, <u>Picard v. St. Tammany Parish Hosp.</u>, 611 F.Supp. 608, 620 (E.D.La. 2009)(holding that "Because the failure to reasonably accommodate an employee's disability is, by definition, a failure to provide that employee with an equal employment opportunity, the Court holds that it is unnecessary to prove a separate "adverse employment action" element in a failure to accommodate case."; <u>Harvey v. Wal-Mart Louisiana, LLC</u>, 665 F.Supp.2d 655, 670 (W.D.La. 2009).

[70] See <u>Aryain v. Wal-Mart</u>, 534 F.3d 473, 480 (5th Cir. 2008)(citing <u>Penn State Police v. Suders</u>, 542 U.S. 129, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004).

[71] See <u>Barrow v. New Orleans S.S. Ass'n</u>, 10 F.3d 292, 297 (5th Cir.1994).

[72] See <u>Vallecillo v. U.S. Dep't of Hous. & Urban Dev.</u>, 155 Fed.Appx. 764, 768 (5th Cir.2005)(Emphasis Added).

[73] See <u>Jurgens v. E.E.O.C.</u>, 903 F.2d 386, 390 (5th Cir. 1990).

In this case, a genuine issue of material fact exists as to whether a reasonable person would have felt compelled to resign.  Not only did Dr. Nelson request that Ms. Hinson take early retirement before transferring her, a request that would have left her without a job and thus clearly "worse off", he admits that he knew, well prior to the effective date of the transfer that she would be limited in her ability to perform the job.  Even so, when Ms. Hinson e-mailed Dr. Nelson on May 29, 2015 and expressed that she would be unable to perform the job at FJH in the manner required by Dr. Nelson, his response was that her condition presented "a problem" for him and that he expected her to perform the duties assigned to her – although what he expected of her in the form of personal attendance and supervision requirements directly contradicted CPSB's Extra Duty policy.

The critical question for this Court, then, is whether a "reasonable person" in Ms. Hinson's shoes would have felt compelled to retire if they were in Ms. Hinson's shoes with the physical limitations that she had when faced with a demand to perform work that their own doctor confirmed she should not and could not perform.  Considering Dr. LaRavia's testimony that Ms. Hinson was physically and mentally unable to deal with the pain limitations in her left foot that he opined would result from an increase in the more strenuous activity inherent in the FJH job, it was entirely reasonable for Ms. Hinson to choose retirement over being forced to engage in activities that would be physically injurious to her.  Thus, a genuine issue of material fact exists as to whether Ms. Hinson was constructively discharged.

### E.  Ms. Hinson was replaced by non-disabled employees **and** treated less favorably than non-disabled employees.

There is no dispute that Ms. Thomas' job duties were assigned to a non-disabled employee, Rick Brown, upon her transfer.  Furthermore, Ms. Hinson was treated less favorably than her non-disabled counterpart, Mr. Brown, because she was required to attend and supervise

extended day and/or extracurricular sporting activities at FJH that Mr. Brown, as a non-disabled employee, would not have to attend at FLE.  For each of the foregoing reasons, listed in Sections A through E, *supra*, Ms. Hinson has established a *prima facie* case of discrimination under the ADA.

### F.    Dr. Nelson's transfer of Ms. Hinson despite his knowledge of her medical concerns was blatantly discriminatory.

Dr. Nelson's refusal to accommodate Ms. Hinson and reform his demand that she engage in extended day activities even after she notified him of her inability to engage in such activities in her May 29, 2017 e-mail to him and even after Dr. LaRavia notified him of her deteriorating health in in his May 28, 2017 letter to Dr. Nelson is direct evidence of discrimination under the ADA and the LEDL.

### 1.    No accommodations were made by Dr. Nelson and CPSB.

CPSB cites various district court opinions for the proposition that, in order to succeed on a failure to accommodate claim, Ms. Hinson must establish that she (1) had a disability; (2) was qualified for the job; (3) her employer knew of the disability; (4) she requested an accommodation; (5) a reasonable accommodation existed that would have allowed her to perform the essential functions of the job; and (6) her employer failed to provide such an accommodation.  In that regard, the ADA, 42 U.S.C. § 12112(b)(5)(A), and LEDL, LSA-R.S. 23:323(B)(1), prohibit CPSB from discriminating against a person with a disability by refusing to accommodate known physical limitations, where such accommodations are reasonable.

As the first and second prongs of the above-referenced test have been addressed previously, the second through fourth prongs will be addressed here.  There is no genuine dispute that CPSB knew of Ms. Hinson's disability.  Ms. Hinson underwent surgery in June 2014 for which she was required to attend therapy, physician's visits and miss school time, after which

Dr. Nelson saw Ms. Hinson walking in a boot for months.  Dr. Nelson received confirmation from her physician, Dr. LaRavia, that she required medical leave and received written notice from Ms. Hinson on May 29, 2015 that she could not perform the extra duties of the job at FJH based on her medical condition:

> . . . [I]t is my intent to maintain my duties as a principal.  **However, as I tried to explain to you, I do have health issues that prevent extended extra curricul[ar] activities.**  Since . . . there are several elementary school positions within the Concordia Parish System, **it would be my hope that in planning staffing for the 2015-16 school year you will consider my overall health concerns.  My duties as an elementary principal at FLE are not prohibited by my health.**[74]

Finally, Dr. Nelson admitted that he would not have granted her medical leave absent a condition that limited her ability to work.  Thus, there is no genuine dispute that Dr. Nelson and CPSB had knowledge of Ms. Hinson's disability, regardless of whether it was identified by name.

As for the fourth prong, Ms. Hinson requested multiple accommodations, any of which were easy enough to accomplish, including that the stipend for attending extended day events be given to someone else to cover the events,[75] that she not be required to attend the events,[76] or that she remain as principal of FLE or another elementary school.[77]  Ms. Hinson has also met her burden under the fifth prong, as her request that Dr. Nelson give her stipend to someone else to attend the extended day activities was akin to her assigning someone to attend those activities under CPSB's own Extra Duty policy.  Finally, there is no dispute under the sixth prong that CPSB failed to provide any of the requested accommodations.

---

[74] See Exhibit 1, Deposition of Bobbie Hinson, p. 108, lns. 10-19. (Emphasis Added).
[75] See R., Document 18-5, p. 120 of 157, lns. 9-20.
[76] Id.
[77]

It must be noted that when an employer's unwillingness to engage in a good faith interactive process regarding a requested accommodation leads to a failure to reasonably accommodate a disabled employee, the employer violates the ADA.[78]  CPSB admits that all it had to do to accommodate Ms. Hinson's health-based limitations was to advise Ms. Hinson to remain as Principal of FLE.[79]  Even so, Dr. Nelson refused to discuss or implement any of the requested accommodations for Ms. Hinson.

There is nothing to suggest that any of the requested accommodations would be unduly burdensome or unreasonable.  If Dr. Nelson had simply allowed Ms. Hinson to assign staff members to attend and supervise the more physically demanding extended day and extracurricular activities at FJH, such an accommodation would have been in compliance with CPSB's own policies and procedures, particularly the Extra Duty policy.  Instead, Dr. Nelson required Ms. Hinson to attend and supervise certain events that would, according to Arlana Davis, require Ms. Hinson to stand or move for the length of an entire football game, climb bleachers, walk sidelines and walk beneath the bleachers in a supervisory capacity, a job that was "absolutely" more physically demanding than that of her former position at FLE.

Furthermore, when presented with Ms. Hinson's request to either not attend such events or remain at FLE or another elementary school, as referenced in her May 29, 2015 correspondence to him, Dr. Nelson ended the discussion by telling her that her absence was "a problem" and that she must fulfill the duties he assigned to her.  There was no "good faith interactive process" by CPSB.  That response, by definition, was a violation of the ADA.[80]

---

[78] See Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 736 (5th Cir.1999).
[79] See Exhibit 2, Deposition of Dr. Nelson, p. 120, lns. 19-25; p. 121, lns. 1-12.
[80] See Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 736 (5th Cir.1999).

>    **2.     CPSB's stated reasons for the transfer of Ms. Hinson to FJH and the failure to transfer Ms. Hinson back to FLE are directly discriminatory and/or pretext for disability based discrimination.**

While, Dr. Nelson claims that he transferred Ms. Hinson to FJH because she was qualified and a good disciplinarian, that does not explain why he made no effort to transfer her back to her position at FLE or another elementary school or why he failed to accommodate her by allowing her to assign others to perform extended day activities under the Extra Duty policy, after she and Dr. LaRavia notified him of her inability to work at FJH prior to the effective date of her transfer on July 1, 2017.

Dr. Nelson instead reminded her that her health condition presented "a problem" and that he expected her to "complete all of the responsibilities of your job description regardless of site location." Dr. Nelson placed these demands on Ms. Hinson despite the fact that CPSB's Extra Duty policy did not require her attendance at or supervision of extended day activities but instead afforded her the right to assign those responsibilities to her staff. Dr. Nelson's refusal to allow her to do so in light of the information available to him and the failure to accommodate her disability is direct evidence of CPSB's disability discrimination or, at the very least, evidence of pretext with respect to his refusal to transfer her back to an elementary position more suited to her condition.

Further evidence of pretext exists in the fact that Dr. Nelson approached Ms. Hinson and asked her to retire on April 7, 2015, before transferring her in May 2015 to FJH. A genuine issue of material fact exists as to whether the reason offered by Dr. Nelson for the transfer, i.e. Ms. Hinson's qualifications, was pretext in light of the fact that he asked her to retire within the month prior to her transfer and, when she refused, transferred her to a more physically demanding position soon thereafter. A genuine issue of material fact also exists with respect to

whether Dr. Nelson knowingly placed Ms. Hinson in a situation where she would only have two choices, risk further injury to her health by attempting to perform a job that, according to Dr. LaRavia, she could not, or retire in accordance with Dr. Nelson's April 7, 2015 request.

**G.    Dr. Nelson regarded Ms. Hinson as having a disabling impairment prior to the effective date of her transfer.**

Not only was Ms. Hinson disabled within the meaning of the ADA at the time of her transfer to FJH, Dr. Nelson also regarded her as being disabled.  Ms. Hinson was "disabled" according to 42 U.S.C. § 12102(1)(C), which states that the term "disability" also means "being regarded as having such an impairment (as described in Paragraph 3)."  Although Dr. Nelson now claims that he knew of no disability that would prevent Ms. Hinson from engaging in the work at FJH, Dr. Nelson acknowledges that, before the July 1, 2015 effective date of Ms. Hinson's transfer to FJH, he had knowledge that Ms. Hinson had a medical condition serious enough to be placed on medical leave until the beginning of August 2015.[81]  Dr. Nelson also admits that he would never have granted sick leave to Ms. Hinson if she had not suffered from a condition that limited her ability to work.[82]

In the face of his admitted knowledge of a medical condition that substantially limited Ms. Hinson's ability to work, Dr. Nelson's decision to advise Ms. Hinson that her medical condition presented "a problem" and that he expected her to perform the duties that he required of her at FJH, regardless of the fact that CPSB's Extra Duty policy did not require her to personally perform such duties, as opposed to accommodating her disability, further confirms Dr. Nelson's and thus, CPSB's, discriminatory intent in violation of the ADA and the LEDL.

---

[81] Id. at p. 104, lns. 7-25; p. 105, lns. 1-17.
[82] Id. at p. 142, lns. 20-24.

## IV.    Conclusion

Plaintiff, Bobbie Hinson, has submitted direct and circumstantial evidence to show that genuine issues of material fact exist as to whether she is entitled to damages pursuant to the ADA and the LEDL.  Accordingly, Plaintiff prays that the Motion for Summary Judgment filed by Defendant, Concordia Parish School Board, be denied.  Plaintiff further prays for any other relief to which she is entitled, whether in law or in equity.

Respectfully submitted by:

BREITHAUPT, DUNN, DUBOS,
SHAFTO & WOLLESON, LLC
1811 Tower Drive, Suite D
Monroe, LA 71201
Telephone: (318) 322-1202
Facsimile: (318) 322-1984
E-mail:  lwalters@bddswlaw.com

By:  __/s/ K. Lamar Walters, III_____
          Michael L. DuBos (#23944), T.A.
          K. Lamar Walters, III (#31353)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been served upon all counsel of record via e-mail and electronically via this Court's CM/ECF system on this 22nd day of December, 2017, at Monroe, Louisiana.

_____/s/ K. Lamar Walters, III_____
          K. LAMAR WALTERS, III

24